Davis, J.,
delivered the opinion of the court:
The claimant moves to set aside the judgment heretofore entered in this case and for a new trial upon the following grounds:
“(1) Error of law in this, that the court has decided that so much of the act of Congress approved March 3,1879, as fixed the compensation of the members of the National Board of Health was impliedly repealed by subsequent legislation, whereas, on the contrary, said subsequent legislation refers only to the annual appropriations, and is a mere limitation and restriction upou said annual appropriations, and neither expressly nor by clear implication modifies or repeals the previous law fixing the compensation of the members of the Board.
“ (A) Error of law in this, that the court holds that the members of the Board are dependent on the annual appropriation acts for their compensation, and yet fails to give the claimant the benefit of the appropriation of $5,000 made by Act of March 3, 1885 (23 Stat. L., 496), for salaries and expenses of the Board for the fiscal year ending June 39, 1886.”
The question presented is one of legislative intent, and to discover that intent careful examination must be made of the laws relating to the National Board of Health.
The important statutes upon this subject contain in substance the following provisions:
The organizing act established the Board and authorized it to make or cause to be made such special examinations within the United States or at foreign ports as they deemed best to prevent the introduction of disease. It provided for the members’ emolument and to carry out the act’s intention the sum of $50,000. (Act 3 March, 1879, 20 Stat. L., 484; Supp. Bev. Stat., 480.)
Then came the National Quarantine Act. passed three months later, which gave the Board a very large and very general quarantine power; a power which, so far as is known bous, has never before been given by the National Legislature to any agent of the Executive. The grant of this broad control was coupled with the commensurate appropriation of $500,000. This act was limited in duration to four years. Act 2 June, 1879, 21 Stat. L., 5; Supp. Bev. Stat., 485.)
One month later came the statute which, after making provision as to certain practical details necessary to the proper performance of the duties imposed upon the Board,, closed *86 with the proviso that “ all money hereinbefore authorized to be expended and all contracts made and liabilities incurred by the National Board of Health shall be paid out of the appropriation of $500,000 ” made in the act of June 2,1879. (Act July 1,1879, 21 Stat. L., 46; Supp. Bev. Stat., 500.)
The next year we find an appropriation of $75,000 for “ salaries and expenses” and “to carry out the purposes of the various acts creating the National Board of Health,” with certain provisos as to the use of the $500,000 appropriated June 2, 1879. (Act June 16, 1880, 21 Stat. L., 266.) In 1881 (March 3) a substantially similar appropriation was made, with the proviso that “ no more money should be expended for the above purposes out of any appropriation heretofore made or by virtue of any previous laws,” and $100,000 was also appropriated for aid to local quarantine stations (21 Stat.L., 442). In 1882 (August 7) a more detailed appropriation was made for specific objects named, such as pay of secretary, cost of light, fuel, etc., including an item of $10,000for “ pay and expenses of the members of the Board,” and $100,000 was therein given, not to the National Board of Health, but to the President to use in his direction for quarantine purposes. (22 Stat. L., 315.)
In this act is shown a marked change in the policy of Congress. The act of June, 1879, had still one year to run, but Congress, nevertheless, gave the President discretionary use of a large sum of money in aid of objects formerly placed within the control of the Board of Health ; not only this, but the act added the significant proviso that no money other than that therein appropriated' should be expended for the purposes of the Board of Health, and it also confined the “ duties and investigations” of the Board to three named diseases. So the broad powers given by the act of June, 1879, were by the act of August, 1882, taken from the Board, while at the same time the total amount of their pay and expenses in the current year was specifically limited to a named sum and the “ special examinations or investigations ” which the organizing act (March 3,1879) empowered them to make were strictly confined.
The policy of the Congress, thus indicated by statute, was to transfer to the President from the Board of Health the general oversight and care of quarantine so far as Congress then deemed it advisable to place that subject within national control. The Board of Health being an arm of the *87 Executive, tbe President might, probably, have used it as an agent in the application of the funds in his hands; that he did not do so, but acted through the medium of the Marine Hospital Service, is matter of public history. The act, of 1883 (Act March 3, 22 Stat. L., 613) followed exactly the line marked out in the preceding year; in fact, it went one step further, in that no allowance was made the Board of Health for office rent, fuel, lights, clerk-hire, or anything, except the “compensation and personal expenses” of its members; while in 1885 (23 Stat. L., 49G) an appropriation similar in terms was made but the amount was reduced one-half, while another act approved the same day (March 3, id., 452) pays, by way of deficiency, the secretary to March 1, 1885, and the messenger and office rent to March 31,1885.
The Deficiency Act of the next year (August 4,1886) appropriated $60 “ for salaries and expenses of the National Board of Health ” (24 Stat. L., 289; see also 21 id., 1, 49, 50 , 23 id., 277, 335.)
The Supreme Court has in Langston’s Case (118 IT. S. B., 389) very carefully laid down a rule as to insufficient appropriations, but that tribunal goes no further than to say that where a statute fixes “ the annual salary of a public officer at a named sum without limitation as to time,” it “ should not be deemed abrogated or suspended by subsequent enactments which merely appropriated a less amount for the services of that officer for particular fiscal years, and which contained no words that expressly, or by clear implication, modified or repealed the previous law.”
There is a marked distinction between Langston’s Case and the case at bar. Langston held an office not only expressly created by statute, but often during a long term of years recognized by the legislature, with its salary, an annual salary, and the insufficient appropriation was made in an act which contained no word expressing or implying an intention to repeal the long-existing law or to mark out a new legislative policy as to the compensation of the post of which Langston happened then to be the incumbent.
In Mitchell’s Case (109 IT. S. B., 146) a specific provision for Indian interpreters’ salaries, first found in an appropriation act of 1851, became in 1874 part of the Bevised Statutes. From 1851 to 1877 the interpreters were paid at the rates so pre *88 scribed, but in 1877 an appropriation act, followed during five years by similar acts, reduced their pay until another appropriation act expressly repealed the provision contained in the Revised Statutes, and gave the Secretary of the Interior a sum in gross to be used in his discretion for interpreters’ pay. This course of legislation, the Supreme Court say, distinctly revealed a change in the policy of Congress, an intention to reduce the salaries, an intention to fix those salaries by the appropriation acts for the time covered by those acts, and the court added that “the whole question depends upon the intention of Congress as expressed in the statute,” hence they were of the opinion that the provisions of the Revised Statutes on the subject must be held to have been suspended until finally repealed.
The law in Langston’s Case said that the minister to Hayti, performing certain well-understood services of value to his Government, was to be paid, by the year, a sum fixed by a line of statutes outside of appropriation acts. The Board of Health had, however, no such fixed appropriation; they were to be paid a per diem (and reasonable expenses) “when actually engaged in the performance of their duties ”; those duties were, to make special examinations and investigations “ to aid in the execution of [the] act and the promotion of its object” (§ I); lo obtain information regarding the public health ; to advise certain officials under certain circumstances (§ 2) ; and to make a certain report to Congress at their then next session. (Act of March 3, 1879.)
After this statute Congress materially increased tiie Board’s power; later they materially reduced that power, and diminished the appropriation for compensation until at last this appropriation has disappeared entirely. H0where, however, is any provision made regulating the compensation of members of the Board other than the per diem allowance in the organizing act.
The Congress did not intend to give the members of this Board an annual salary, but they established a body of experts to perform a certain class of duties for compensation fixed to a certain extent, that is, at so much per diem, but dependent, nevertheless, upon the amount of labor performed, and the amount of that labor was prescribed from time to time by the Congress. At first it was extensive, and then the appropriations *89 for compensation were apparently commensurate with the duties imposed. Later the scope of the Board’s labor was most materially reduced and confined to the investigation of three named diseases, while the control of the large quarantine appropriations was taken from them and vested directly in the President, who has since expended it through other agents. With this reduction of duties we find a corresponding reduction in the provision for compensation, until there is a final entire failure of appropriation for that purpose, and an intent evidenced by deficiency acts to stop further expense iu this direction. (Deficiency acts of March 3, 1885, and August 4, 1SS0.)
We are of opinion that in creating the Board of Health the Congress intended to organize a board, advisory in character, to which they could from time to time turn for assistance, as such assistance might become necessary, and while rendering this assistance the civilian (as distinct from the governmental) members of the Board were to receive a per. diem compensation. This being so, the appropriation becomes the measure of the aid desired by the Congress in any one year, and as the members of the Board need render no more service than the appropriation contemplates, so the Government is not under obligation to pay them for any service they may voluntarily render in excess of that provided for in the appropriation.
This is not a case of persons contracting with the Government for partial service under a general appropriation, but is in its nature a contract by a single body, made up of a number of individuals, to perform all the work authorized by an appropriation. (N. Y. C. and H. R. R. R. v. The United States, 21 C. Cls. R., 473, and eases cited). The members of the Board of Health were chargeable with notice of the amount authorized by the Congress to be expended in each year for the services required of them. This is especially true of claimant, who was not only a member of the Board but also its secretary and disbursing agent. The members were not separate contractors, acting'independently in tho prosecution of different portions of a work provided for by one general appropriation, but were superior officers acting as a board in the administration of a fund. As to the claim based upon the appropriation of $5,000 made by the act of filaren 3,1885, it does not appear that plaintiff has not received his due proportion thereof.
Motion denied.